FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 FEB 13  AM 10: 55

LORETTA G. WHYTE
CLERK

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

RESHONE M STEWART        CIVIL ACTION

versus

                                      JUDGE CLEMENT

WILLIAM J HENDERSON,        MAG. WILKINSON
      POSTMASTER GENERAL       NO. 00-0114 N/2

## EX PARTE MOTION AND MEMORANDUM FOR LEAVE TO FILE OUT-OF-TIME WITNESS AND EXHIBIT LISTS

Plaintiff moves for leave to file her witness and exhibit lists which were due

n December 22, 2000.   Plaintiff's lists track her interrogatory answers nos. 1, 5 and

6, attached.  Although defendant objected (October 10, 2000) to plaintiff's listing no

witnesses in response to an interrogatory for a cumulative listing, the deposition of

plaintiff proceeded as scheduled on November 6 and 22, 2000.  Plaintiff had

intended to formalize the answer to the interrogatory for a cumulative list after the

deposition, but forgot.

No motion to compel a listing has been filed and no depositions have been

sought.  Furthermore, defendant has had the benefit of the USPS Report of

Investigation.  Therefore, defendant cannot claim prejudice.

DATE OF ENTRY

FEB 14 2001

Fee _____
Process _____
X  Dktd _____
✓  CtRmDep _____
Doc.No. _____

Respectfully submitted,

*J Courtney Wilson*

J Courtney Wilson 13561
210 Baronne
New Orleans, La 70112
525-4361

## O R D E R

IT IS ORDERED that plaintiff be permitted to file her witness and exhibit lists.

New Orleans, La., this_____day of February, 2001.

_____
UNITED STATES MAGISTRATE JUDGE

*file unsigned*

*2·12·01*

**CERTIFICATE OF SERVICE**
I CERTIFY A COPY OF THIS PLEADING WAS SERVED
BY MAIL UPON ALL COUNSEL OF RECORD
_____
ATTORNEY AT LAW

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RESHONE M STEWART                          CIVIL ACTION

versus

                                          JUDGE CLEMENT
WILLIAM J HENDERSON,                       MAG. WILKINSON
    POSTMASTER GENERAL              NO. 00-0114 N/2

## PLAINTIFF'S WITNESS AND EXHIBIT LIST

**Witness List**

Blackwell, Brenda
Brooks, Robert
Burrell, Todd
Coleman, Elemuel
Johnson, Melanie
Kailas, Indira, M.D.
Kirkland, Keith
Lucien, Kathleen
Price, Seymore
Rowel, Cornell
Ruda, Anthony
Smith, Rosalyn
Smith, Willie
Stewart, Stephen
Watson, Aubrey
Watson, Jesse
Williams, Jesse
Williams, Ray
Any witness listed by defendant

**Exhibit List**

Witness statement, October 21, 1998

ATTACHMENT TO PRECOMPLAINT COUNSELING FORM
RESHONE  STEWART - 8/11/99

Any exhibit listed by defendant

Respectfully submitted,

J. Courtney Wilson 13561
210 Baronne
New Orleans, La 70112
525-4361

**CERTIFICATE OF SERVICE**
I CERTIFY A COPY OF THIS PLEADING WAS SERVED
BY MAIL UPON ALL COUNSEL OF RECORD
2/14/01  J. Wilson
ATTORNEY AT LAW

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RESHONE M STEWART                     CIVIL ACTION

versus
                                      JUDGE CLEMENT
WILLIAM J HENDERSON,                  MAG. WILKINSON
     POSTMASTER GENERAL          NO. 00-0114 N/2

## ANSWERS TO INTERROGATORIES NOS. 1-4

### ANSWER NO.1:

     Reshone Stewart Sorrell       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
     Reshone Monica Stewart        Husband - Stephen
     7180 Whitmore Pl              Children-Bria (5), Jade (4), Tela (2)
     NOLA 70128

     5131 Bundy Rd
     Apt X 23
     NOLA 70127

     1110 S Dorgenois
     NOLA 70125

### ANSWER NO. 2:

     DOM 10/9/93

### ANSWER NO. 3:     This is a partial list; for complete list, please see SS records.

     USPS (3/29/97 to date)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RESHONE M STEWART

CIVIL ACTION

versus

JUDGE CLEMENT
WILLIAM J HENDERSON,          MAG. WILKINSON
    POSTMASTER GENERAL          NO. 00-0114 N/2

_SUPPLEMENTAL_

**ANSWERS AND RESPONSES TO DEFENDANT'S DISCOVERY OF
AUGUST 9, 2000**

**INTERROGATORY NO. 5:** This answer will outline the incidents. She can not remember every incident now and will not be able to do so at her deposition. She remembers new events at random times, sometimes when she can not sleep. She has tried to forget what happened.

On at least three occasions Pierce came unnecessarily close to her machine while she was cleaning and brush her buttocks. This was the first inappropriate thing or remark he initiated. This occurred about her third week on the job. The first time he brushed her buttocks was before the "tall woman" period. (See below.) On the third occasion she complained to him. This was the last time he did this. This occurred about 2-3 weeks after the first incident.

The first remark was that he was into "tall women." This was his most frequent remark and he made it during late April/May through August/September 1997at least twice a week. Plaintiff objected to these remarks and complained to Cornell Rowel, then an automation clerk. She understood that both Rowel and Pierce were Masons.

Rowel said that he would talk to Pierce who stopped his remarks for a week or so, but began to stare at her. Pierce continued to stare at her every day he was

there for the next year or so until she was transferred to Mark-up.
The stares were nasty in a sexual way.

On about May 9, 1997 she had to go to the hospital because she was about to faint. Pierce and Jesse Williams who had hurt his leg went with her to the hospital.

She went to the union steward (Seymore Price) in the middle of May when Pierce started with the "freak" remarks and licking his tongue. He continued to lick his tongue at her right until she went into mark-up. When he would pass he would do this. Price said that he would talk to the MDO's about it. The "freak" remarks stopped, but not the tongue licking. He told her that she could go the EEOC if matters did not get better.

In May/June 1997 she called the EEOC and spoke to Ms Rita Scott and explained to her what was happening, but Ms Scott did not get back to her. Then plaintiff tried to contact Mr Charles Hamilton; she left messages, but he did not call back.

There was one occasion in June when Pierce became her administrative supervisor. Mr Williams was sick; he called in to say that he had been hearing things about Pierce and he told her that he had told her once to file charges (at which time he warned her about probation). This time he told her to go ahead and file sexual harassment charges even though she was are still in her probation period. Plaintiff did not file charges because she was afraid to do so in her probation period.

She talked to Brenda Blackwell about Pierce.

Later during the "tall women" period she wore an orange sleeveless shirt. Pierce remarked that he "might be into shoulders." This occurred in the OCR area when she was bringing her rejects to this area which he supervised. This was the only time he made this remark.

Later that night he bit her on the shoulder. This occurred at her machine DBCS # 4. The time was about 3-4 weeks after Todd Burrell started work or about May/June 1997. Burrell saw Pierce bite her. She showed Willie Smith the bite mark.

-2-

She called the Postal Inspector about the bite, but this office told her that she could not file charges unless her life were in danger. She made this call within 2-3 weeks after speaking perhaps with Eddie Smith, union steward, who had suggested this call. She also spoke to Seymore Price, also a union steward, about the bite.

In late May/early June at night Pierce came into the cut area and remarked to Keith Kirkland that plaintiff was going to file sexual harassment charges against him. Plaintiff explained why. Pierce smirked and left.

He used to say that he wanted to be her "freak." During one point he would say this daily. This period was about late May/early June 1997 and lasted about one month. One time was in the 918 cut area 2-3 times in front of Todd Burrell. Ray Williams may be a witness to one of these times.

He made the "sweet to eat" remark once. This occurred in the late "freak" period. She was in the 918 cut area. There may be witnesses - Ray Williams and Willie Smith.

Throughout both the "tall women" and "freak" periods at least a half dozen times he would say something like. "You know, I sure like beautiful women." In the context of the other remarks and the tone this was not an innocent remark.

About early August 1997 he asked her to breakfast at the end of the shift. She declined.

He continued to make the above comments and lick his tongue.

In late August/early September 1997 Pierce told plaintiff's work group that all PFT's would have to work on Labor Day. When plaintiff came in for the Monday-Tuesday night shift, she found that Yolanda Rogers had been excused for that time.

On September 14, 1997 she asked Pierce for EAL for her sick daughter. He told her that if she brought in documentation it would be approved. She took leave, but on September 18 (am) she learned that Pierce had not approved it which exposed her to a charge of being absent without permission; this incident provoked her first written complaint. She was turned over to Ms Jones, Time and Attendance supervisor, who turned the matter over to MDO Parks.

-3-

On about September 22, 1997 she sought her first medical help; she saw Dr Kailas who counseled her and prescribed Exofor. She also saw EAP.

On September 29, 1997 so many co-workers asked her about having filed sexual harassment charges that she left work crying.

She was off work under Dr Kailas' orders from September 29 to October 15, 1997. Dr Kailas requested a workplace change. She was switched to a new work station (#135) only a few feet away from where she had been stationed, but just as much under Pierce's authority and just as accessible to him as before.

On October 20, 1997 at about 12:45 and 1:00 am Travella Domino told plaintiff that Pierce had told her "To wait until it was all over; he would show her." At about 3:30 she spoke to a union rep, Eddie Smith, about the threat. He asked if she would put the statement in writing. Plaintiff did not see Ms Domino again that morning, but called her. Ms Domino declined.

Except for several months (February to late July/early August, 1998 during her pregnancy when she worked on the patch up table, even closer to Pierce) she stayed at #135 from October 1997 until her transfer to mark-up was approved on November 21, 1998. She returned to work from her pregnancy in early October, 1998.

At work station # 135 and the patch up table from October 1997 to November 21, 1998, except for the time she was off work because of her pregnancy, Pierce continued to harass her.

At #135 before she was pregnant Pierce would walk by and wink his eye and lick his lips. On one occasion he shot a rubber band at her. Possible witnesses would be Cornel Rowel and Rosalyn A Smith.

At the patch up table he would just walk by constantly. Possible witnesses are several ladies whose names are not known.

On October 21, 1998 after she came back from her pregnancy she filed a union witness statement (attached) with steward Elemuel Coleman. Pierce, acting as MDO, had come on her unit at #135 the last two days. He stared, winked, and licked his tongue at her. Once he actually came on her machine. He gave her an

-4-

intimidating smirk and laugh. Possible witnesses would be her co-workers at this time.

A month later she was transferred to the mark-up unit. Thereafter, Robert Brooks, union steward, told her that "management" referred to her as 'trouble." He first told her this about 2-3 weeks after she was transferred. The last time he told her this was late 1999/early 2000. Melanie Johnson may have some information.

When she would come in to work in the morning on this unit she would see Pierce. He only stared at her. At first these stares were nasty in a sexual way. For the last three months the stares have been of the type that say, "I'm gonna get you."

Recently he has begun to show up when plaintiff visits Harrah's. This has occurred 5 times, the last time being September 17, 2000. He stares and smirks. There are no witnesses. Plaintiff's counsel wrote counsel for defendant about this matter.

Meanwhile, Robert Brooks, union steward, told her in @ June/July 1999 that Trevor LNU in personnel had shown him several e-mails trying to force her out of the mark-up unit back to processing and distribution in closer proximity to Pierce. On August 5, 1999 she    was    directed to leave mark-up and report to the automation floor where, although she would not work the same shift as Pierce and Watson, she would have 1 ½ hr overlap with them. This directive was made by personnel (Judy Miller and James Oliver) despite a settlement leaving her in mark-up until the conclusion of her lawsuit. (This grievance was terminated with the statement of Anthony Ruda, District Manager.)(Attached.)

**INTERROGATORY NO. 6:**   Since she filed her September 1997 EEOC charge she has been:

denied transfer to mark-up in December 1997 by personnel;

made a PTF in October/November 1998 in mark-up after she was made full-time by personnel;

directed on August 5, 1999 to leave mark-up and report to the automation floor where although she would not work the same shift as Pierce and Watson she would have 1 ½ overlap with them - this directive was

made by personnel (Judy Miller and James Oliver) despite a
settlement leaving her in mark-up until the conclusion of her lawsuit.
(This grievance was terminated with the statement of Anthony Ruda,
District Manager.)(Attached.)

pulled off the clock on @ August 18, 1999 as injurious to herself and others
by MDO Aubrey Watson . All of these matters have been successfully
grieved;

denied her next step increase, due in December 2000, by personnel (pending).

**INTERROGATORY NO. 7:**    Plaintiff drops this contention.

**INTERROGATORY NO. 8:**    See above. Seymore Price confirmed that
Ms Rogers was off this day.

**INTERROGATORY NO. 9:**    See above.

**INTERROGATORY NO. 10.**    See above.

**INTERROGATORY NO. 11:**    See above.

**INTERROGATORY NO. 12:**    See above.

**INTERROGATORY NO. 13:**    See above.

**INTERROGATORY NO. 14:**    Kathleen Lucien and Melanie Johnson, union
stewards, were present on some occasions when Brooks told her that management
was referring to her as trouble and that he had seen e-mails trying to put her out of
mark-up unit. She has never seen the e-mails.

**INTERROGATORY NO. 15:**    She is depressed every time she goes to
work. She had nightmares 3-4 times since the last incident at Harrah's. The last
one had Pierce laying next to her in bed. Before Harrah's she had nightmares once
a week although some months she would have none. She would jump up out of bed
with the feeling that Pierce had sent someone to hurt her. Others may be described
at deposition if remembered.

-6-

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RESHONE M STEWART                    CIVIL ACTION

versus

                                     JUDGE CLEMENT
WILLIAM J HENDERSON,                 MAG. WILKINSON
        POSTMASTER GENERAL           NO. 00-0114 N/2

## <u>NOTICE OF HEARING</u>

Please take notice that plaintiff will bring on her motion for leave to file

witness and exhibit lists on the _28_ day of _Feb_ , 2001 at _11 am_

before the Magistrate.

Respectfully submitted,

*J Courtney Wilson* 13561
210 Baronne
New Orleans, La 70112
525-4361

**CERTIFICATE OF SERVICE**
I CERTIFY A COPY OF THIS PLEADING WAS SERVED
BY MAIL UPON ALL COUNSEL OF RECORD
_____
ATTORNEY AT LAW